UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION


IN RE:

TIMOTHY J. LOFTUS                                  Chapter 7
and RITA L. LOFTUS,

___Debtors.___                          Bankruptcy No. 04-03463S

TIMOTHY J. LOFTUS
and RITA L. LOFTUS,

    Plaintiffs,

v.                                      Adversary No. 06-09132S

SALLIE MAE SERVICING, and
TEXAS GUARANTEED STUDENT LOAN CORPORATION,

    Defendants,

and

EDUCATIONAL CREDIT MANAGEMENT CORPORATION,

    Intervenor-Defendant.


<u>ORDER RE COMPLAINT TO DETERMINE DISCHARGEABILITY</u>

     The matter before the court is the final trial of
plaintiffs' complaint to determine the dischargeability of
student loan obligations pursuant to 11 U.S.C. § 523(a)(8).
Trial was held April 4, 2007 in Sioux City.  Attorney Wil L.
Forker appeared for plaintiffs, Timothy J. Loftus and Rita L.
Loftus.  Attorney Marty L. Rowlet appeared on behalf of defendant
Texas Guaranteed Student Loan Corporation ("Texas Guaranteed").
Attorney Christopher C. Foy appeared for intervenor-defendant
Educational Credit Management Corporation ("Educational Credit").

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Timothy and Rita Loftus filed a joint Chapter 7 petition on September 3, 2004. The Loftuses were separated at the time of their filing and are now divorced. Timothy, age 43, lives in Lawton, Iowa. Rita, 34, lives in Sioux City. The Loftuses share physical and legal custody of their three sons, ages 11, 6 and 4. Neither of them is obligated to pay child support to the other.

In 1987, Timothy Loftus received a Bachelor of Arts degree in Mass Communication from Morningside College in Sioux City. After graduation, he worked for approximately two years at KTIV television station in Sioux City as a film director. He estimated his gross earnings were less than $10,000 per year.

Loftus believed he would have better earning capacity with a master's degree, and in 1989 he began attending Northeast Louisiana University, now known as the University of Louisiana at Monroe.[1] In 1991 he obtained a Master of Arts degree in communication in radio, television and film. While working on this degree, Loftus had three jobs. He was a teaching assistant, he taught continuing education classes at a computer learning center, and he also worked at a Red Roof Inn.

Loftus enjoyed teaching and aspired to teach at the university level. He learned that he could obtain a second

---

[1] The university changed its name in 1999.
<http://www.ulm.edu/universityrelations/sketch.html>

2

master's degree for half the number of credit hours required for the first.  He continued taking classes and in 1992 received a Master of Education degree in educational media.  He also continued working as a teaching assistant.  Loftus then began working toward an educational specialist degree, a two-year program.  In 1994 he left the University before completing the program.

The Loftuses met while they were students at the university. They married in 1994, and their first child was born in 1996. Rita Loftus obtained a Bachelor of Fine Arts degree in graphic design in 1997.  While in school she had work-study jobs with the university yearbook and newspaper.  In 1996, she worked part time at a Wal-Mart store in Monroe.  For approximately a year and a half, Timothy was employed as an instructor in the computer science department of the university.  He taught students to use basic applications such as spreadsheet programs.

In 1997, shortly after Rita's graduation, the Loftuses moved to Lawton.  Timothy's parents and other of his family members live in the Sioux City area.  The Loftuses rented a four-bedroom house from Timothy's parents.

From about August 1997 to early summer 1998, Timothy worked for Excel Connect, a firm in Bettendorf.  His pay rate was between $36,000 and $38,000 per year.  He worked on-site for MidAmerican Energy Company in Sioux City, training its employees

3

to use computer applications in the Windows operating system.
When the contract with MidAmerican was completed, Loftus was laid
off.  Excel Connect did not have other jobs in the Sioux City
area, and it did not make a firm offer of employment in
Bettendorf.

In about September 1998, Timothy began working in Sergeant
Bluff for MCI WorldCom as a news station coordinator, which
involved updating information on an in-house television system.
His salary was about $30,000 per year.  Loftus was laid off in
early 2002.

Sometime in 1998, Rita began working 32.5 hours a week as a
secretary for Augustana Lutheran Church.  Rita's beginning pay
rate at Augustana was $7.00 per hour.  When she left the job in
2004, she was earning $9.00 per hour.  Currently, she is the
manager of the Linens & Things store in Sioux City, working 47.5
hours per week for $10.00 per hour.

The Loftuses had combined wage income of $44,941 in 1999,
$41,911 in 2000 and $41,383 in 2001.

Timothy currently designs advertising for the Sergeant Bluff
Advocate, a weekly newspaper.  The paper has about 900
subscribers and employs four people.  In February 2006, he began
working also as an independent contractor for Siouxland Sports
Authority, a monthly tabloid.  He receives $650 per issue,
although he has earned more by doing extra work.  He uses desktop

4

publishing and graphics editing computer software to design the publication.

Timothy has had irregular income from an art gallery business in Lawton known as Loftus Gallery. When the Loftuses moved to Iowa from Louisiana, they rented a house from Timothy's parents for $525 per month. His parents later allowed him to use a commercial building that they own for no additional rent. The commercial building and the residence are separate properties and are not in close proximity to each other.

Timothy converted the commercial building into a pottery studio and art gallery. The property is a large square building with an addition on the back. There is a 10- by 12-foot room for the gallery, another room containing a pottery kiln, a kitchenette, and a pottery workshop in the addition. Timothy's parents own the pottery equipment. He keeps a desk and computer in the pottery workshop area. He uses the computer for newspaper design work, but he could also do this work at home.

The gallery business has been in existence at least since 1999. For about eight months, perhaps after being laid off from MCI WorldCom, Timothy attempted a more stable business activity making wheel-thrown pottery for sale to art shops. Rita did not receive a salary from Loftus Gallery. The gallery sold one of her paintings, and she used the money to purchase art supplies.

It appears that the Loftus Gallery was used merely for tax

advantages.  The Loftuses' joint income tax returns from 1999
through 2003 and Timothy's individual returns from 2004 through
2006 reported business loss as follows:

|      | Gross Income | Rent | Utilities | Total Expenses | Net Loss |
|------|-------------|------|-----------|----------------|----------|
| 1999 | 190 | 6,300 | 270 | 10,165 | 9,975 |
| 2000 | 487 | 6,300 | 822 | 7,293 | 6,806 |
| 2001 | 353 | 6,300 | 1,109 | 7,707 | 7,354 |
| 2002 | 1,794 | 6,300 | 628 | 11,154 | 9,360 |
| 2003 | 9,921 | -0- | 3,590 | 14,001 | 4,080 |
| 2004 | | | | | |
| 2005 | | | | | 7,558 |
| 2006 | 7,850 | 6,300 | 2,502 | 9,350 | 1,500 |

Exhibits C, D, E, F, G, 7, 8, 10.  Timothy's income tax returns
for 2004 did not show either income or loss from a business.

Timothy's Iowa and federal returns for 2005, Exhibit 8, show
a deduction of $7,558 for business loss that year.  The exhibit
did not include the Form 1040 Schedule C, Profit or Loss from
Business.  In answer to interrogatories propounded by Texas
Guaranteed, Timothy stated that income from Loftus Gallery in
2005 was $305.00.  Using this figure, the court calculates that
he reported business expenses of $7,863 for the year.

The rent expense of $6,300 per year for the business
represents $525 per month, the rent Timothy pays his parents for
his residence and the use of the art gallery building.

Timothy's Form 1040 Schedule C for 2006 states that it is a
report of loss from the operation of Loftus Gallery.  The gross
income figure of $7,850 is not income from the sale of art,

6

rather it is his income from Siouxland Sports Authority.

The figures shown in Timothy's income tax returns are difficult to reconcile with the bank statements in evidence. Checking account 11119549 at First American Bank, Sioux City, is in the name of Loftus Gallery.  Exhibit P includes bank statements for this account for the months of January, March, April, September, October, November and December 2005.  During these months, there were made credits totaling $296.00 and debits totaling $276.99.  As discussed above, Timothy's 2005 tax returns reflected income of $305 and expenses of $7,863 for the operation of Loftus Gallery.

The Loftus Gallery bank statements for 2006 show that Timothy deposited his income from Siouxland Sports Authority into that account.  Exhibit P includes 2006 bank statements for the Loftus Gallery for February through September.  During this period, there were total credits of $4,715 and debits of $4,575.44.  On 2006 Form 1040 Schedule C, gross income from business was $7,850 and expenses totaled $9,350.

The Loftus Gallery statement for the month of February 2006 indicates that money was transferred into the account from account 11119591.  There are no bank statements for account 11119591 among the exhibits in evidence.

In 2005 and 2006, Timothy Loftus had three bank accounts in addition to the accounts at First American Bank.  At First Trust

7

and Savings Bank, Lawton, he had checking accounts 637009 and 637025.  At Pioneer Bank, Sergeant Bluff, he maintained checking account 204242.

Timothy stated that he paid his parents $525 per month for rent of his house and use of the art gallery building.  In all the bank account statements in evidence, there is no record of a single check in the amount of $525.  Timothy said that he paid his parents cash when he was able to do so.  He also said that he frequently borrowed money from his parents in amounts up to several hundred dollars.

There were several deposits to the accounts that do not appear to be earnings from the Sergeant Bluff Advocate or Siouxland Sports Authority.  On June 14, 2005, a deposit of $1,939.19 was made to the Pioneer Bank account.  The Pioneer Bank monthly statement dated February 20, 2006 shows total credits of $9,417.72 for the period.  From March 22 through April 28, 2006, deposits totaling $4,748.06 were made as follows:

| Date | Amount |
|---------|----------|
| 3/22/06 | 544.36 |
| 3/27/06 | 265.00 |
| 3/28/06 | 1,400.00 |
| 4/05/06 | 544.34 |
| 4/12/06 | 650.00 |
| 4/13/06 | 200.00 |
| 4/14/06 | 100.00 |
| 4/19/06 | 644.36 |
| 4/28/06 | 400.00 |

Exhibit R.

Loftuses have received the following income tax refunds:

|      | Iowa  | Federal |            |
| ---- | ----- | ------- | ---------- |
| 1999 | 697   | 1,981   |            |
| 2000 | 514   | 1,851   |            |
| 2001 | 665   | 3,360   |            |
| 2002 | 365   | 3,053   |            |
| 2003 | 505   | 4,609   |            |
| 2004 | 1,100 | 6,656   | (Timothy)  |
| 2004 |       | 2,194   | (Rita)     |
| 2005 | 1,444 | 5,635   | (Timothy)  |
| 2005 |       |         | (Rita)     |
| 2006 | 1,139 | 7,257   | (Timothy)  |

Exhibits C-G, 7-10.  Rita's tax return information was incomplete for tax years 2004 and 2005, and no information was provided for her 2006 return.  For tax years 2003 through 2006, the Loftuses received earned income credits.  None of the tax refunds from tax years 1999 through 2006 were applied toward the Loftuses' student loan obligations.

Timothy made a number of efforts to obtain a job making use of his advanced degrees.  In 1991 after receiving his master's in communication, he made between ten and twenty job applications and had a few interviews.  He pursued positions at television stations and in a few other areas, including marketing.  After receiving his master's in education, he applied to Louisiana State University in Baton Rouge.  He briefly taught computer skills at a parochial grade school, but he found that working with this age group did not suit him.

After being laid off from MCI WorldCom in 2002, Loftus

opened an account with "monsterjobs.com," a job search business
that operates on the internet.  He sent out between 70 and 90
resumes for teaching and management positions.  This effort
resulted in one interview with Northwest Iowa Power Cooperative,
a firm in LeMars, Iowa.  He sent resumes to Omaha and Sioux
Falls.  He applied to Missouri State University.  He may have
applied for jobs in Minneapolis, but he did not recall sending
resumes to Des Moines.

Since filing his bankruptcy petition in 2004, Loftus has
applied for four or five teaching positions at colleges and
universities in the northwest Iowa area.  In November 2006 he
applied to the University of South Dakota in Vermillion for a
position teaching newspaper design.  Although he was qualified
for this position, he did not get the job.

Rita Loftus currently has the following monthly expenses:

| | |
|---|---|
| Rent | 550 |
| Utilities | 60-200 |
| Water | 40 |
| Telephone | 40 |
| Food | 350 |
| Clothing | 50 |
| Transportation | 80 |
| Medical | 42 |
| Health insurance | 83 |
| Term life insurance | 9 |
| Auto insurance | 45 |
| Child care | 200 |

Rita's food expense is the amount she receives in food stamps.
She takes medication for a thyroid condition, but is otherwise
healthy.  Rita and the couple's children are covered by health

insurance through her employment.  The children are generally healthy and developing normally.  They spend about half of their time with each parent.  Rita and Timothy each pay half of the health insurance premium and share the cost of ADD/ADHD medication for one of their sons.  They also split the expense of day care for the children, each paying $200.  Rita drives a 1995 Plymouth vehicle with 222,777 miles.  There is no debt against the vehicle.  The court will assume Rita's average utility expense is $150 per month.  The court finds that her total monthly expenses are $1,639.

Rita earns $760 net every two weeks.  This amount is equivalent to $1,646.66 per month.  Her income exceeds expenses by less than $8.00, but her budget includes nothing for recreation or miscellaneous expenses.  The court finds that her current net disposable income is zero.

At trial, Timothy estimated his monthly expenses as follows:

| | |
|---|---|
| Rent | 525 |
| Utilities | 200-400 |
| Water | 50-70 |
| Telephone | 92-100 |
| Cell phone | 63 |
| Food | 430-645 |
| Clothing | 50 |
| Auto insurance | 51 |
| Health insurance for children | 83 |
| Child care | 200 |

In January 2007 in response to interrogatories, Timothy identified expenses in these additional categories:

11

```
Medical                 30
Transportation         180
Term life insurance     25
Recreation              50
Miscellaneous           75
```

Exhibit B.

Timothy's telephone bill includes charges for basic internet service and basic cable.  He uses a cell phone for work and so that his sons' daycare is able to reach him.  The monthly food expense is based on Timothy's testimony that he spends $100 to $150 per week.

Timothy's estimate of $200 to $400 per month for utilities includes heat and electricity for the Loftus Gallery building. The court finds this expense is neither reasonable nor necessary. In response to interrogatories, Timothy estimated his utility expense at $175 to $250 per month, a range the court finds is a more reasonable estimate.

Timothy's employment with the Sergeant Bluff Advocate provides him with health insurance, but the policy has a high deductible.  In March 2007, Timothy was given prescriptions for Wellbutrin for depression, and Ambien, a sleep aid.  He has some out-of-pocket expense for prescriptions.  His medical condition does not affect his ability to work.

Timothy drives a 1997 Buick Century that he received in 2002 from his grandfather.  The car has 135,000 miles and is beginning to require some repairs.

12

Timothy shares his house with his partner, who has four children himself.  The children are at the house at times. Timothy's partner contributes about $150 to $200 per month toward household expenses.

Timothy states that his net monthly income is $2,298.75. Exhibit 4.  Adding the contribution of his partner gives him current income of about $2,498.75 per month.  His expenses are between $2,079 and $2,397 per month.  His disposable income is between $100 and $400 per month.

Timothy financed his degree from Morningside College with work-study employment, grants, scholarships, and loans totaling between $5,000 and $10,000.  The loans were paid in full by about 1989.

The loans at issue in this proceeding are those borrowed by Timothy and Rita to attend the University of Louisiana at Monroe. Rita incurred student loan debt of about $30,000.  Timothy borrowed a total of about $138,000 for graduate studies at the university.  In 1998, all of Rita's student loans and some of Timothy's were consolidated into a loan now owned by Texas Guaranteed.  As of April 2, 2007, the balance owing on this debt was $119,705.07.

The remainder of Timothy's loans are owned by Educational Credit.  Educational Credit's Exhibit A identifies the loans in the most detail and appears to provide the most current

13

information as to loan balances.  This debt consists of 29 loans
which have not been consolidated.  The total balance owed by
Timothy Loftus to Educational Credit as of December 14, 2006 is
$193,689.85.  The individual loans are identified as follows:

| Loan No. | Total Owed | Interest Rate | Per Diem |
|---|---|---|---|
| 1 | 7,573.48 | 7.94 | 1.65 |
| 2 | 16,101.66 | 7.94 | 3.50 |
| 3 | 13,147.12 | 7.94 | 2.86 |
| 4 | 8,157.77 | 7.94 | 1.75 |
| 5 | 5,099.62 | 7.94 | 1.10 |
| 6 | 8,018.13 | 7.94 | 1.72 |
| 7 | 3,519.24 | 7.94 | 0.76 |
| 8 | 11,458.68 | 7.94 | 2.46 |
| 9 | 8,433.67 | 7.94 | 1.81 |
| 10 | 3,435.89 | 7.94 | 0.74 |
| 11 | 1,602.48 | 7.94 | 0.34 |
| 12 | 9,946.20 | 7.94 | 2.14 |
| 13 | 6,705.50 | 8.09 | 1.49 |
| 14 | 3,642.80 | 8.49 | 0.84 |
| 15 | 3,559.71 | 8.49 | 0.82 |
| 16 | 6,053.81 | 8.34 | 1.37 |
| 17 | 2,827.23 | 8.34 | 0.64 |
| 18 | 12,722.12 | 8.34 | 2.87 |
| 19 | 2,431.24 | 8.49 | 0.56 |
| 20 | 3,710.88 | 8.49 | 0.85 |
| 21 | 4,240.93 | 8.49 | 0.97 |
| 22 | 7,428.82 | 8.49 | 1.71 |
| 23 | 2,371.50 | 8.49 | 0.54 |
| 24 | 4,778.20 | 8.49 | 1.10 |
| 25 | 4,221.58 | 8.09 | 0.92 |
| 26 | 8,720.26 | 8.09 | 1.91 |
| 27 | 5,758.77 | 8.09 | 1.26 |
| 28 | 13,118.97 | 8.09 | 2.87 |
| 29 | 4,903.59 | 8.09 | 1.07 |
| Total | $193,689.85 | | $42.62 |

Exhibit A.  Each loan accrues interest at a variable rate.  The
interest rate shown is the rate effective on December 14, 2006.
There was no evidence to explain how the rate is determined.

14

In about 1999, during the period that Timothy was employed by MCI WorldCom, the Loftuses made six to ten payments of $150 on their student loans.  No other payments were made at any time.

The loans have been in "deferred" or "forbearance" status at various times.  In about the spring of 2003, Loftuses tried to consolidate their student loans through the William D. Ford program, but the request was rejected.  About four months later, the loans were defaulted and fees and interest were added to the principal amount of the loans.

Loftuses' bankruptcy petition filed September 3, 2004 was their second bankruptcy case.  Their first Chapter 7 petition was filed June 22, 1998, shortly after Timothy was laid off from Excel Connect.  On July 28, 1998, only Timothy filed an adversary proceeding to determine the dischargeability of his student loan obligations.  He voluntarily dismissed the complaint because the loans did not fall within the seven-year provision for dischargeability that was in effect under Bankruptcy Code § 523 at that time.

When Loftuses filed their second bankruptcy petition in 2004, more than 98 percent of the debt on their schedule of general unsecured creditors was student loan debt.  On September 20, 2004, they filed a complaint to determine the dischargeability of their student loans.  In June 2005, the parties filed a stipulated dismissal without prejudice in order

15

to implement an agreement to repay the loans under the William D.
Ford student loan program.  The agreement regarding the Ford
program fell through, and this adversary proceeding was commenced
August 10, 2006.

The payments under the proposed repayment plan would have
been $60 per month.  Timothy said he had the ability to pay that
amount.

## Discussion

Loftuses ask the court to determine that their student loan
obligations are dischargeable pursuant to Bankruptcy Code §
523(a)(8).  This section provides that a Chapter 7 discharge does
not discharge educational loans unless excepting the debt from
discharge would impose an undue hardship on the debtors and the
debtors' dependents.  11 U.S.C. § 523(a)(8).  Loftuses bear the
burden of proving by a preponderance of the evidence that their
circumstances warrant a discharge of the loans on the basis of
undue hardship.  Reynolds v. Pennsylvania Higher Education
Assistance Agency (In re Reynolds), 425 F.3d 526, 529 (8th Cir.
2005); Ford v. Student Loan Guarantee Foundation of Arkansas (In
re Ford), 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001).

The determination of undue hardship for purposes of §
523(a)(8) requires an examination of the totality of the
circumstances.  Long v. Educational Credit Management Corp. (In
re Long), 322 F.3d 549, 553 (8th Cir. 2003).  The court must

16

consider: (1) the past, present, and reasonably reliable future financial resources of the debtor; (2) a calculation of the reasonably necessary living expenses of the debtor and the debtor's dependents; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. Id., 322 F.3d at 554.  "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt--while still allowing for a minimal standard of living--then the debt should not be discharged."  Id. at 554-55. The debtor must show that he has done everything possible to maximize his income and minimize his expenses.  Clark v. Educational Credit Management Corp. (In re Clark), 273 B.R. 207, 210 (Bankr. N.D. Iowa 2002).

One of the four repayment plans offered by the U.S. Department of Education under the William D. Ford Federal Direct Loan Program is an income contingent repayment plan ("ICRP").  20 U.S.C. § 1087e(d), (e).  The repayment amount under the ICRP is limited to 20% of the debtor's discretionary income, defined as the amount by which the debtor's adjusted gross income exceeds the poverty guidelines.  34 C.F.R. § 685.209(a); Lee v. Regions Bank Student Loans (In re Lee), 352 B.R. 91, 96 (B.A.P. 8th Cir. 2006).

The term of repayment under the ICRP may not exceed 25 years.  20 U.S.C. § 1087e(d)(1)(D).  Any unpaid portion of the

17

loan is cancelled at the end of the repayment period.  34 C.F.R.
§ 685.209(c)(4)(iv); Long v. Educational Credit Management Corp.
(In re Long), 292 B.R. 635, 637 (B.A.P. 8th Cir. 2003).  The
availability of an ICRP is but one factor in determining undue
hardship; it is not determinative of the issue.  In re Lee, 352
B.R. at 95; Ford v. Student Loan Guarantee Foundation of Arkansas
(In re Ford), 269 B.R. 673, 677 (B.A.P. 8th Cir. 2001).


<u>Timothy Loftus</u>

Several factors weigh against the discharge of Timothy's
student loan obligations.  He is young and in relatively good
health.  He has two graduate degrees in communications and
education.  He has acquired marketable knowledge and skills in
the areas of communications and computer technology.  Timothy's
decision to live in a small town in northwest Iowa has been a
self-imposed geographical limitation on his employment options.
In recent years he has restricted his job search further by
making very few applications and by applying for positions only
at colleges and universities in the area.

Timothy has not made his best effort to maximize income and
reduce expenses.  At present, he is subsidizing the living
expenses of his partner who contributes only $150 to $200 per
month toward maintaining the household.  A payment of $400 per
month plus money for food would be a more equitable division of

such expenses.

Timothy argues that his student loan debt should be discharged because the total amount owed is more than $300,000. However, the size of the debt is a function of the large amount of money he borrowed--about $138,000 to attend graduate school-- and the many years the loans have accrued interest and gone without payment.  It appears that Timothy has never taken responsibility for the debt.  When he returned to Iowa in 1997 with his family, Timothy obtained a position that paid between $36,000 and $38,000.  The very next year he attempted to discharge his student loans in bankruptcy before making a single payment on the debt.  In about 1999, he made the only payments ever made on the debt, a total of $900 to $1500, although the Loftuses had household income greater than $40,000 each year in 1999, 2000 and 2001.  A little more than six years after the date of their first petition, Loftuses filed a second Chapter 7 case. The scheduled debt was almost entirely student loan debt incurred by Timothy.

Timothy concedes that he has the ability to make payments of $60 per month, the amount that was proposed under the Ford program.  As discussed above, the court finds that his disposable income is between $100 and $400 per month.  Therefore, Timothy has the ability to pay a significant amount toward his student loans even if he does not increase his earnings or require his

19

partner to pay a greater share of the household expenses.  In
light of all the foregoing factors, the court finds and concludes
that Timothy has not shown that excepting his student loan
obligations from discharge would cause undue hardship.

### Rita Loftus

Rita Loftus is also young and in good health.  She has a
bachelor degree in graphic design, which has been indirectly
useful in her work.  It does not appear, however, that she has
specialized job skills.  She has worked as a church secretary and
in retail stores.  Her present wage of $10 per hour is the
highest she has earned in the ten years since graduation.  Rita
receives public assistance in the form of food stamps.  At
present she has no disposable income available for repayment of
her student loans, and it does not appear that her situation will
change in the foreseeable future.

Rita apparently left it to Timothy to make payments on her
student loan debt, which was consolidated with some of his loans
in 1998.  Thus, there were very few payments made on the debt
despite household income that would have allowed regular payments
over a number of years.  Nevertheless, Rita did not attempt to
discharge her student loan obligation until 2004, after the
couple had separated.

Rita's student loan obligation is the debt to Texas

Guaranteed, which totaled $119,705.07 as of April 2, 2007.  It is
a significant factor in this case that most of her debt stems
from loans incurred by Timothy prior to their marriage.
Therefore, considering the totality of the circumstances, the
court finds and concludes that Rita's student loan obligation
should be discharged.

IT IS ORDERED that the claim of Timothy J. Loftus is
dismissed.

IT IS FURTHER ORDERED that the student loan obligation of
Rita L. Loftus is discharged pursuant to 11 U.S.C. § 523(a)(8).

DATED AND ENTERED  June 29, 2007

William L. Edmonds, Chief Bankruptcy Judge